

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2001

# Dixon Ticonderoga Co v. Estate of O'Connor

Precedential or Non-Precedential:

Docket 99-6056

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Dixon Ticonderoga Co v. Estate of O'Connor" (2001). *2001 Decisions.* Paper 88.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/88

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-6054, 99-6055, 99-6056

DIXON TICONDEROGA COMPANY,
Appellant in No. 99-6054

v.

ESTATE OF WILLIAM F. O'CONNOR; SCHUMANN
HESSION KENNELLY & DORMENT; SCHUMANN HANLON
& PANEPINTO; HAROLD FRIEDMAN; KIRSTEN, SIMON,
FRIEDMAN, ALLEN, CHERIN & LUTKIN; GREENBERG
MARGOLIS; FRANZBLAU DRATCH & FRIEDMAN;
STRYKER TAMS & DILL; SCHUMANN HANLON
O'CONNOR & MCCROSSIN

HAROLD FRIEDMAN; STRYKER TAMS & DILL,
Third-Party Plaintiffs

v.

DECOTIIS, FITZPATRICK & GLUCK; CONNOLL Y EPSTEIN
CHICCO FOXMAN ENGELMYER & EWING; STEVEN J.
ENGELMYER; LISA E. BRODY,
Third-Party Defendants

HAROLD FRIEDMAN, Appellant in No. 99-6055

FRANZBLAU DRATCH, F/K/A GREENBERG MARGOLIS,
Appellant in No. 99-6056

On Appeal From the United States District Court
For the District of New Jersey
(D.C. No. 96-cv-00810)
District Judge: Honorable Katharine S. Hayden

Argued: February 6, 2001

Before: BECKER, Chief Judge, AMBRO and STAPLETON,
Circuit Judges.

(Filed: April 23, 2001)

STEVEN J. ENGELMYER, ESQUIRE
  (ARGUED)
LISA E. BRODY, ESQUIRE
HEATHER R. WEISS, ESQUIRE
Kleinbard, Bell & Brecker, LLP
1900 Market Street, Suite 700
Philadelphia, PA 19103

Counsel for Dixon Ticonderoga

ANDREW M. EPSTEIN, ESQUIRE
  (ARGUED)
Lampf, Lipkind, Prupis & Petigrow
80 Main Street
West Orange, NJ 07052

Counsel for Harold Friedman

RICHARD T. GAROFALO, ESQUIRE
  (ARGUED)
THOMAS D. FLINN, ESQUIRE
Garrity, Graham, Favetta & Flinn
One Lackawanna Plaza
P.O. Box 4205
Montclair, NJ 07042

Counsel for Franzblau Dratch

PETER DeSALVO, JR., ESQUIRE
  (ARGUED)
Soriano, Henkel, Salerno, Biehl &
 Matthews
75 Eisenhower Parkway
Roseland, NJ 07068

Counsel for Estate of William F.
O'Connor; Schumann Hession
Kennelly & Dorment; Schumann
Hanlon & Panepinto; Schumann
Hanlon O'Connor and McCrossin

2

OPINION OF THE COURT

BECKER, Chief Judge.

These are consolidated appeals from the grant of summary judgment in favor of the defendants in a two-tiered legal malpractice action governed by New Jersey law. The seeds of this case were sown in the early 1980s when Plaintiff Dixon Ticonderoga Company (Dixon) sold a piece of industrial property to a company named the Dixon Venture (Venture). Defendant William O'Connor--who was affiliated with Defendant Schumann Hanlon & Panepinto (the Schumann firm)--represented Dixon in connection with the sale. Between the time Dixon agreed to sell the property to Venture and the time the sale closed, the New Jersey Legislature enacted the Environmental Cleanup Responsibility Act (ECRA), which imposed substantial new clean-up responsibilities on owners of industrial property that wished to sell their land.

In the first tier of this action, Dixon charges that O'Connor committed malpractice by failing to advise it about ECRA, and submits that his failure resulted in its transaction with Venture being subject to ECRA. Dixon did not comply with ECRA prior to transferring ownership of the property to Venture, and Venture sued Dixon to recover clean-up costs that it was forced to incur in connection with the sale. Though a trial court originally dismissed Venture's suit, the appellate courts reinstated it, and Venture ultimately obtained a substantial judgment against Dixon. Dixon claims that this judgment was the direct result of O'Connor's negligence.

The second tier of this case involves Dixon's legal malpractice claims against Defendant Harold Friedman, who during all relevant times was affiliated with Defendant Franzblau Dratch. Friedman represented Dixon during much of the litigation brought against it by Venture. In 1989, Friedman spoke with Dixon's outside counsel about the possibility of suing O'Connor for malpractice. Dixon submits that this conversation created an attorney-client relationship between it and Friedman with respect to a

3

potential malpractice claim against O'Connor , and alleges that Friedman breached his professional duties to it by allowing that claim to become time-barred.

Dixon filed the instant suit against O'Connor , the Schumann firm, Friedman, and Franzblau Dratch in 1996. Soon thereafter, O'Connor and the Schumann firm moved to have the claims against them dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) as time-barred. Though Friedman and Franzblau Dratch opposed this motion, it was granted by the District Court. Friedman and Franzblau Dratch appeal from this aspect of the District Court's judgment. Later, the District Court granted summary judgment in favor of Friedman and Franzblau Dratch. The court held that, even assuming that he created an attorney-client relationship between himself and Dixon with respect to a potential malpractice action against O'Connor, Friedman had breached no pr ofessional duty that he owed to Dixon. Dixon appeals from this portion of the judgment.

To resolve both tiers of this appeal we must first decide when Dixon gained and lost the right to sue O'Connor for malpractice. Under New Jersey law, the time for bringing a legal malpractice claim expires six years after the claim accrued. As we will explain, accrual occurs when a prospective plaintiff gains knowledge of two elements: (1) that his or her lawyer has been at fault; and (2) that he or she has been injured due to the lawyer's err or. Because O'Connor's alleged fault in this case lies in his failure to inform Dixon about ECRA prior to the closing of the Venture deal, we conclude that the first element was satisfied in either late 1984 or early 1985, when Dixon learned that ECRA had applied to the transaction. We further determine that Dixon was damaged by O'Connor's purported error by October 21, 1985, when Dixon incurred attorneys' fees in responding to V enture's demands that it comply with ECRA.

In so concluding, we reject several arguments offered by Friedman and Franzblau Dratch in favor of a later accrual date. Friedman submits that the limitations period did not commence until the New Jersey appellate courts first issued a ruling adverse to Dixon in the suit br ought against

Dixon by Venture. We disagree, both because the Supreme Court of New Jersey has rejected per se rules in this context, and because we believe that the necessary prerequisites for accrual were satisfied long before that time. Franzblau Dratch submits that the statute did not begin to run until Venture first sued Dixon, and that the limitations period was tolled between the time that the trial court threw out the Venture litigation and the time that the appellate courts reinstated it. Based on these premises, Franzblau Dratch contends that the statute of limitations did not run on Dixon's claim against O'Connor until after Friedman left Franzblau Dratch, and it submits that it cannot be held liable as a result. We reject this submission because: (1) it is ultimately irrelevant due to our disagreement with Franzblau Dratch as to when Dixon's claim against O'Connor accrued; (2) the tolling argument rests on a mistaken view of what O'Connor is alleged to have done wrong; and (3) the tolling argument is inconsistent with the policies behind New Jersey's statute of limitations and is unsupported by any relevant New Jersey case law. We therefore hold that Dixon's claims against O'Connor and the Schumann firm accrued by October 21, 1985 and that the limitations period on those claims ran by October 21, 1991. Because the instant suit was not filed until 1996, we will affirm the portion of the District Court's judgment that dismissed the claims against O'Connor and the Schumann firm.

We will, however, reverse the portion of the District Court's judgment that granted summary judgment in favor of Friedman and Franzblau Dratch because we conclude that there are genuine issues of material fact that preclude us from determining whether the 1989 conversation between Friedman and Dixon's outside counsel created an attorney-client relationship with regard to a potential malpractice action against O'Connor, and, assuming that it did, whether Friedman committed malpractice. According to the Restatement of Law Governing Lawyers, whose standards the parties agree govern this case, an attorney-client relationship is created with respect to a given matter when: (1) a person informs a lawyer that he or she wants the lawyer to provide legal services with respect to a given matter; (2) the lawyer does not refuse; and (3) the lawyer

5

knows or should know that the person reasonably relies on the lawyer to provide such services.

The existence of the first factor is essentially conceded. We conclude that there is a genuine issue of fact going to the second element, because our review of the r elevant deposition transcripts indicates that there is at least a conflict as to whether Friedman ever refused to undertake the representation. Finally, there is a genuine issue as to whether the third factor is satisfied because: (1) Friedman and Dixon had a preexisting (and ongoing) r elationship involving a related matter; (2) Friedman admitted that he gave Dixon legal advice about suing O'Connor in 1989; and (3) a reasonable reading of the deposition transcripts supports an inference that during the 1989 conversation Friedman promised to discuss the matter with Dixon again at a later date. Although two letters that Dixon's outside counsel wrote to Friedman in 1992 could be r ead as suggesting that Dixon was not relying on Friedman to provide it with legal advice regar ding a malpractice action against O'Connor, we do not believe that they so establish as a matter of law.

If the 1989 conversation created an attor ney-client relationship, we also believe that ther e is a genuine dispute as to whether Friedman committed malpractice. A lawyer who assumes a representation must exer cise reasonable and ordinary care over the matters entrusted to him or her. Because the undisputed evidence establishes that Friedman did nothing at all between the 1989 conversation and the running of the statute of limitations in 1991, we conclude that there is a genuine issue as to whether he breached a professional duty that he owed to Dixon.

I.

A.

As generations of children and standardized test-takers know, Dixon makes pencils.1 For over a hundred years, it
_____

1. Appellant Dixon Ticonderoga Company was created by a September 1983 merger of the Bryn Mawr Corporation and the Joseph Dixon Crucible Company.

owned a 36-building industrial facility in Jersey City, New Jersey (the Jersey City property). The events underlying this appeal began to take shape in 1982 when Dixon decided to sell the Jersey City property, and r etained attorney O'Connor to advise it regar ding the sale.

On April 28, 1983, Dixon agreed to sell the Jersey City property to Morris Industrial Builders, which immediately assigned its rights to Venture. Under the contract, Venture was to lease several of the buildings back to Dixon for a period of two years following the sale; we will r efer to this as the "lease-back." The contract also contained an "as is" clause, stating that Venture was acquiring the property "without any representations as to[the] character or quality [of the property] except as expressly provided herein." Closing was made contingent upon Ventur e's obtaining a zoning variance; the contract provided that closing would occur within 60 days of it doing so.

Though the variance seems to have been obtained on October 12, 1983, the sale was not closed within 60 days of that time. Instead, on October 31, a lawyer for V enture wrote to O'Connor in his capacity as Dixon's counsel. The letter represented (falsely, it seems) that the variance had not yet gone through, and purported to extend the time for closing as provided in the contract. O'Connor did not question the basis for the extension, nor did he pr ess for an immediate closing. On January 27, 1984, however , O'Connor wrote to Venture, noting that the contractually-required conditions had occurred and accusing Venture of "delaying this closing for reasons which ar e not the concern of Dixon." O'Connor sent another letter on February 7, fixing February 24 as the "time of the essence" date for the closing. The transaction eventually closed on that date.

Unbeknownst to Dixon and Venture, a significant development had occurred between the time they entered into the contract on April 28, 1983 and the time the deal closed on February 24, 1984. In September 1983, the New Jersey Legislature enacted ECRA, which imposed significant new clean-up responsibilities on owners of industrial facilities that wished to transfer their property.2
_____

2. In 1993, ECRA was renamed the "Industrial Site Recovery Act." See N.J. Stat. Ann. S 13:1K-6.

The new rules, however, were made applicable only to transfers occurring after December 31, 1983. See N.J. Stat. Ann. S 13:1K-6 (Historical & Statutory Notes; Effective Date). Though "[t]he passage of ECRA was no secret to the legal community," neither O'Connor nor counsel for Venture advised either party about ECRA prior to the closing. As a result, the parties made no ef fort to close before the statute's effective date or to deal with its requirements in their agreement. Dixon did not clean up the Jersey City property as requir ed by ECRA before transferring ownership to Venture. Repr esentatives of both Dixon and Venture have subsequently stated that they would have attempted to structure their transaction to avoid ECRA applicability had they known about the statute.

Although neither Dixon nor Venture was aware of ECRA when they closed, Dixon soon realized its mistake. Dixon's sale of the Jersey City property had been part of a corporate-wide process of moving its operations to Florida. This process also included the selling of its corporate headquarters, which at that time was also located in Jersey City. Dixon retained Friedman to assist in this latter sale, which included getting a letter from New Jersey's Department of Environmental Protection stating that the transaction did not implicate ECRA. In the course of carrying out these responsibilities, Friedman became aware of Dixon's sale of its Jersey City property, and realized that the closing date had rendered that transaction subject to ECRA. Sometime in either late 1984 or early 1985, Friedman spoke with the man who had served as Dixon's chief negotiator in the sale of the Jersey City pr operty, and informed him that ECRA had applied to that sale.

Venture also realized that the closing date on the sale of the Jersey City property had render ed the transaction subject to ECRA. On July 15, 1985, it sent a letter demanding that Dixon comply with ECRA in connection with the impending termination of the lease-back. On October 9, 1985, Venture again wr ote to Dixon, noting that the sale's closing date had rendered it subject to ECRA. The second letter was addressed to Friedman as Dixon's counsel, and Friedman directed an associate to draft a response on behalf of Dixon. Friedman's fir m sent a letter

8

to Venture on October 21, 1985. Friedman stated that he assumed that he billed Dixon for these services.

Venture was eventually forced to engage in an extensive environmental clean-up of the Jersey City pr operty, and on May 27, 1986 it sued Dixon in the Superior Court of New Jersey to recover those costs. We will r efer to this as the "Venture litigation" (or "action" or "suit"). Venture raised claims under ECRA and another New Jersey envir onmental statute, as well as various common law theories. Though Friedman did not originally represent Dixon in the Venture action, he was retained to do so in November 1987. The Superior Court granted summary judgment in favor of Dixon on February 18, 1988, holding, inter alia , that the sole remedy for a non-conforming sale under ECRA was rescission and recovery of affiliated costs. This decision, however, was reversed by the Appellate Division, which on July 21, 1989 held that ECRA permits a transferee (like Venture) to sue a transferor (like Dixon) for damages arising from a non-conforming sale. See Dixon Venture v. Joseph Dixon Crucible Co., 561 A.2d 663 (N.J. App. Div. 1989). Dixon appealed.

Shortly after the Appellate Division decision in 1989, Friedman spoke with Dixon's outside counsel, Richar d Joyce. At that time, Joyce raised the possibility of suing O'Connor for malpractice, based on the latter's failure to advise Dixon about ECRA prior to the sale of the Jersey City property. In their depositions, Friedman and Joyce offered largely consistent accounts of this conversation, but there were also some discrepancies. Both agreed that Friedman told Joyce that he doubted that a claim against O'Connor would have merit, and Friedman admitted that this "probably" constituted "advice to a client." Both were also in accord that during the 1989 conversation Friedman advised Joyce that it might be tactically unwise to sue O'Connor. Because the Venture action appeared headed to trial and because O'Connor had represented Dixon in the underlying transaction, Friedman counseled Joyce that it might "be helpful to have Mr. O'Connor or some of his firm available [to assist in that matter] because we weren't quite sure what all the issues would be, and maybe[knowing] what went on at the beginning would be helpful."

9

The record is also clear that in 1989 Friedman expressed a certain amount of professional reluctance about suing O'Connor. Friedman recalled telling Joyce that: "I don't like to handle claims against lawyers, and I'm not sur e that this one has any real foundation, and I'm certainly not going to handle a claim that I don't think has a foundation." Joyce concedes that Friedman never told him that he would handle a malpractice claim against O'Connor, and that Friedman explained that such claims were "not within his area of expertise." Joyce was unequivocal, however, that Friedman never expressly refused to handle such a claim.

There is also some disagreement between Friedman and Joyce as to how they ended the 1989 conversation. Friedman testified that they left it by concluding that "we don't have to make that decision [i.e., whether to sue O'Connor] now, we are going to forge ahead with the petition for certification and hopefully get the Supreme Court to do something about" the Appellate Division decision that had reinstated the Ventur e suit. Joyce's deposition testimony is murky, but according to the reading most favorable to Dixon (which we must adopt due the procedural posture of this case) Friedman ended the conversation by telling Joyce: "I don't handle[malpractice cases] personally, but I'll check with my fir m. Maybe they do, and, if not, I've got others who can."3 Friedman admitted that he probably billed Dixon for this conversation. He also conceded that he took no action with respect to a potential malpractice claim against O'Connor between 1989 and 1992, i.e., he never resear ched the legal issues, investigated the underlying facts, or attempted to find another lawyer for Dixon.

Dixon's hopes that the Supreme Court of New Jersey would reverse the Appellate Division's decision were dashed on January 30, 1991, when the Supreme Court affirmed

_____

3. Joyce was unequivocal that Friedman made a statement to this effect in 1992. But the transcripts can also be read to say that Friedman made such a statement in 1989. Because this case is at the summary judgment stage and because it is the non-movant, Dixon is entitled to have all ambiguities resolved in its favor . See infra Part II. Accordingly,
we will read Joyce's testimony as declaring that Friedman also made such a statement in 1989.

10

the Appellate Division's judgment. See Dixon V enture v. Joseph Dixon Crucible Co., 584 A.2d 797 (N.J. 1991). The Supreme Court remanded the case to the Superior Court for trial, see id. at 800, where Dixon was held liable to Venture for over $3 million, of which just under $1.5 million were awarded as damages on the ECRA claim.

Friedman and Joyce next spoke about suing O'Connor in the spring of 1992.4 Joyce told Friedman that "it would seem that we had a malpractice action against the prior firm, that it seemed--just looking at it, it would seem that we had some relief in attempting to make the company whole, that is it something we should consider ." Joyce claims that Friedman then told him that "he did not personally handle malpractice cases, that he was not sure if it was something that his firm would do, something he could look into, but that he also was aware of attorneys in and around the area who could handle it for us." Joyce admitted that Friedman expressed "a pr ofessional reluctance to ever have to do something like that to, you know, another attorney."

After this conversation, Joyce stated that he was"under the impression that [Friedman] was moving forward with either determining whether or not his fir m would handle it or he would engage someone on our behalf to make us whole," but admitted that he had not given Friedman the authority to hire counsel on Dixon's behalf, and was simply "waiting for Mr. Friedman to get back to me to tell me how we were going to proceed." Friedman r ecalled the 1992 conversation somewhat differently. He claimed to have told Joyce that "I really did not want to pursue a claim [against O'Connor], that if he wanted, he could." Friedman stated that he did not recall how he and Joyce had left that conversation, but he was clear that he did not understand Joyce to have told him to pursue a claim against O'Connor, and that he would not have done so had he been asked.

On August 19, 1992, Joyce sent Friedman a letter whose caption stated that it was about "Dixon V enture v. Dixon Ticonderoga." Joyce wrote that"it would seem the following

_____

4. We have omitted details of this conversation that are irrelevant to our disposition.

11

strategic moves would be in order." One such "move" was suing O'Connor:

> As distasteful as it is for me professionally, it would seem that our attorney at the time of closing should have known of the ECRA requirements and, therefore, a malpractice action should be initiated -- hopefully, by your firm.

(emphasis added). Friedman did not respond.

On November 25, 1992, Joyce wrote Friedman another letter with the same caption. In addition to discussing the Venture suit, Joyce stated:

> [I]t is clear to me that we were ill-advised by counsel at the time of the closing as to our potential ECRA responsibility. It has come to my attention, however, that there may be stringent statutory time limitations on advising counsel of his screw-up. Considering the obvious malpractice in this case, I certainly hope we are not constrained by a technicality. I'm sur e you would agree that we must proceed immediately.

Joyce also referred Friedman to a lawfirm that Dixon had used "for environmental matters." At the close of the letter, Joyce wrote: "I should also point out that[this] firm does handle malpractice (the scum) and insurance work and, if your firm does not, please feel free to discuss these issues also."

B.

Having retained other counsel, Dixon commenced this legal malpractice action in the United States District Court for the District of New Jersey in March of 1996. The Complaint named six defendants: the estate of W illiam O'Connor;[5] O'Connor's former law firm, the Schumann firm; Friedman; Franzblau Dratch, the law firm with which Friedman had been affiliated during many of the events underlying Dixon's claim against him; and two other law firms with which Friedman had been associated at various

_____

5. O'Connor died in 1992. We will r efer to his estate as "O'Connor" during the remainder of this opinion.

12

times. Friedman's Answer raised cross-claims against two other law firms and two other attorneys, and both Friedman and Franzblau Dratch pled rights of indemnification and contribution against various other parties. The case was assigned to Judge William G. Bassler.

Rather than answer, O'Connor and the Schumannfirm filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking to have the claims against them dismissed as time-barred. Dixon did not oppose the motion, but Friedman and Franzblau Dratch did. The District Court eventually granted the motion. Further motion practice resulted in the uncontested dismissal of the claims against all defendants and third-party defendants except Friedman and Franzblau Dratch. During this period, the case was reassigned to Judge Katherine S. Hayden.

Dixon, Friedman, and Franzblau Dratch eventually moved for summary judgment. On October 16, 1999, Judge Hayden rendered an oral ruling stating that she would grant summary judgment in favor of Friedman and Franzblau Dratch based on her conclusion that, as a matter of law, Friedman had not been negligent. Dixon filed a timely notice of appeal, reciting that it was appealing only the portion of the final order entering summary judgment in favor of Friedman and Franzblau Dratch. Friedman and Franzblau Dratch filed cross-appeals, contesting only the dismissal of the claims against O'Connor and the Schumann firm. See also Dixon's Opening Br. at 59 ("[T]his Court should reverse the District Court's grant of summary judgment in favor of Harold Friedman, Esquir e and Franzblau Dratch . . ., and remand this case to the District Court for a trial on the merits consistent with this Court's opinion.").6

II.

This is a diversity case, and, accordingly, Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), mandates that we "apply the substantive law produced by . . . the highest

_____

6. The District Court had subject matter jurisdiction under 28 U.S.C. S 1332(a). We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

court of the [relevant] state." In re Asbestos Litig., 829 F.2d 1233, 1237 (3d Cir. 1987). Statutes of limitations are substantive for Erie purposes. See Guaranty Trust Co. v. York, 326 U.S. 99, 110 (1945). The parties agree that New Jersey law governs the issues of when Dixon's malpractice claim against O'Connor accrued and expired, and whether there is a genuine issue of material fact as to whether Friedman committed malpractice.

New Jersey law provides that "[i]f an attorney shall neglect or mismanage any cause in which he is employed, he shall be liable for all damages sustained by his client." N.J. Stat. Ann. S 2A:13-4. "A legal-malpractice action derives from the tort of negligence." Grunwald v. Bronkesh, 621 A.2d 459, 463 (N.J. 1993). Accordingly, a plaintiff must prove the traditional elements: the existence of a duty; a violation of that duty; and causation of har m. See id. This case involves two tiers of malpractice claims: (1) Dixon's claims against O'Connor and the Schumann fir m, based on the former's failure to advise it about ECRA; and (2) Dixon's claim against Friedman and Franzblau Dratch, based on Friedman's allowing Dixon's claims against O'Connor and the Schumann firm to become time-barr ed.

We are faced with two issues on appeal. Judge Bassler granted the Rule 12(b)(6) motions brought by O'Connor and the Schumann firm to dismiss Dixon's claims against them as time-barred. Friedman and Franzblau Dratch appeal from that ruling. Our standard of r eview is plenary, i.e., de novo, see Lake v. Arnold, 232 F .3d 360, 365 (3d Cir. 2000), and we consider this issue in Part III. The second issue before us is whether Judge Hayden properly granted summary judgment in favor of Friedman and Franzblau Dratch on the ground that--even assuming that an attorney-client relationship arose with respect to a potential malpractice action against O'Connor--Friedman br eached no professional duty that he owed to Dixon. Summary judgment, of course, is appropriate only when"there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the nonmoving party, Dixon is entitled to have any factual disputes resolved in its favor , and to the benefit of all reasonable inferences that can be drawn from

14

the facts. See, e.g., Gruenke v. Seip, 225 F .3d 290, 298 (3d
Cir. 2000).7 We r eview de novo this aspect of the District
Court's judgment, see, e.g., Watson v. Eastman Kodak Co.,
235 F.3d 851, 854 (3d Cir. 2000), and discuss this issue in
Part IV.

III.

We must first consider when Dixon gained and lost the
right to sue O'Connor. Our resolution of these questions is
critical for two reasons. First, it will dispose of the cross-
appeals brought by Friedman and Franzblau Dratch, which
challenge the District Court's order dismissing the claims
against O'Connor and the Schumann firm as time-barred.
Second, our determination of these issues is a necessary
predicate for resolution of Dixon's appeal of the grant of
summary judgment in favor of Friedman and Franzblau
Dratch. The gravamen of Dixon's claim against Friedman
(and, consequently, against Franzblau Dratch) is that
Friedman failed to advise it as to when the limitations
period would run on a legal malpractice action against
O'Connor. To assess whether ther e is a genuine dispute of
material fact as to whether Friedman acted negligently, we
must, therefore, know when the statute ran.

A.

Under New Jersey law, legal malpractice claims ar e
subject to a six year statute of limitations. See N.J. Stat.
Ann. S 2A:14-1; Grunwald v. Bronkesh, 621 A.2d 459, 461
(N.J. 1993). That period begins to run when a claim
accrues, which is governed by the "discovery rule," which
operates "to postpone the accrual of a cause of action when
a plaintiff does not and cannot know the facts that
constitute an actionable claim." Grunwald, 621 A.2d at

_____

7. Though Dixon also moved for summary judgment on its claims against
Friedman and Franzblau Dratch, Judge Hayden denied its motion.
Because Dixon has not appealed this aspect of the District Court's
judgment, the only question is whether Judge Hayden properly granted
summary judgment in favor of Friedman and Franzblau Dratch. Dixon is
the nonmoving party for purposes of that inquiry.

15

463. A legal malpractice claim accrues when the client gains knowledge of two elements: "fault" and"injury" (which is synonymous with "damage"). Id.

A prospective plaintiff acquires knowledge of an attorney's "fault" when he or she realizes that the lawyer has been negligent, and when he or she knows or should know that any harm arising out of a given transaction or matter "is attributable to the attorney's negligent advice." Id. at 466. The Supreme Court of New Jersey has eschewed laying down bright line rules for determining when this requirement is satisfied: A client need not suffer an adverse judgment before determining that his or her lawyer has committed malpractice, but neither does the existence of such a judgment necessarily establish that the client was thereinafter charged with such knowledge. See id. Indeed, depending on the circumstances, a client may gain knowledge of his or her attorney's fault before, during, or after the resolution of an underlying matter . See id.

Damages must be "real and substantial as opposed to speculative" to start the running of the statute of limitations, id. at 465, but the Supreme Court of New Jersey has broadly defined the concept of"injury." That Court has held that "[i]t is not necessary that all or even the greater part of damages have to occur before the cause of action arises." Id. (quotation marks and citations omitted). And though "actual damages may exist in the form of an adverse judgment," they may also arise, "in the form of attorney's fees, before a court has announced its decision in the underlying action." Id.

B.

To apply these precepts, we must identify three moments in time: the point when Dixon first had reason to believe that O'Connor had been negligent; the instant when it was first harmed by O'Connor's alleged malpractice; and the moment at which Dixon had reason to believe that the harms that it had suffered were caused by O'Connor's supposed errors. We believe that Dixon was on notice that O'Connor had been negligent in either late 1984 or early 1985, when Friedman informed a Dixon representative that

16

the Jersey City property's sale date had r endered the transaction subject to ECRA--a fact that O'Connor had never mentioned.

It is critical to remember the nature of the malpractice with which Dixon charges O'Connor. This is not a case where O'Connor gave Dixon bad advice about ECRA; rather, the record shows that O'Connor never even mentioned ECRA or stated that it might apply to the sale of the Jersey City property. As a result, Dixon closed the Venture deal without giving any consideration to ECRA. Accor dingly, as soon as it learned that the transaction's closing date had rendered it subject to ECRA, Dixon had r eason to believe that O'Connor had erred by omission.

We next conclude that Dixon was injur ed by O'Connor's alleged malpractice by October 21, 1985--the date by which it had incurred an obligation to pay attorneys' fees to Friedman's firm in connection with r esponding to Venture's ECRA-based demands. Venture lear ned that ECRA had applied to the sale of the Jersey City property in the summer of 1985, and soon realized that Dixon had not complied with the statute's clean-up requir ements. Venture sent Dixon letters dated July 15, 1985 and October 9, 1985 demanding that Dixon comply with ECRA; the latter letter specifically noted that the sale's closing date (February 28, 1984) had triggered ECRA duties. Dixon then r etained Friedman's firm to respond to V enture's demands. Friedman directed an associate to prepar e a response on behalf of Dixon, which was dated October 21, 1985. Friedman "assume[d]" that he billed Dixon for these services.

By the time the October 21 letter was sent, O'Connor's alleged malpractice had injured Dixon. Had O'Connor done his job, Dixon's argument goes, the sale would never have been subject to ECRA at all.8 But because O'Connor did not

_____

8. To have avoided ECRA, Dixon and V enture would apparently have had to do two things: (1) they would have needed to close prior to December 31, 1983; and (2) Dixon would have needed to for ego the lease-back. Dixon has submitted evidence that these steps could have and would have been taken had the parties known about ECRA. Robert Morris, who

17

advise Dixon about ECRA prior to the closing, Dixon was forced to retain Friedman's firm to respond to Venture's demands. Even if it did not tender payment immediately, Dixon certainly acquired an obligation to pay Friedman's firm by the time the October 21, 1985 letter was mailed. And because Grunwald squarely held that incurrence of attorney fees can constitute damages for purposes of starting the statute of limitations, see Grunwald v.

_____

signed the contract of sale on behalf of Venture, certified that "ECRA's applicability . . . could have easily been avoided, if I had been aware of ECRA prior to closing." Specifically, Morris stated that he "would have tendered the purchase price and closed . .. prior to December 31, 1984," and represented that he "had the necessary financing in place to do so." Morris also claimed that he "would have for egone the lease-back to Dixon," and that he "would have done so in exchange for a reduction in the purchase price equal to the present value of the stream of anticipated profits." Morris submitted that "any reasonable businessman would have been able to agree to this or similar terms" and noted that his "contract negotiations with Dixon had gone r easonably well, and we were able to agree on all other material terms." Gino Pala, who served as Dixon's CEO during the relevant time period, testified that Dixon was "ready to leave [the Jersey City pr operty] at any time," and that it "wanted to get out as soon as possible." David Brewster, who was a member of Dixon's board at the time of the sale and later served as its CEO, certified that had he been aware "that ECRA liability could [have been] avoided by closing the transaction befor e ECRA's effective date, [he] would have insisted that the transaction close prior to December 31, 1983." Brewster stated that he was "not aware of any reason why the transaction could not have closed prior to December 31, 1983." Brewster also represented that he would have agr eed to forego the lease-back entirely because "even if that resulted in a reduced purchase price . . . [i]t would have been worth losing a few hundr ed thousand dollars in order to avoid millions of dollars of ECRA liability." Friedman disputes these allegations, averring that the scenario of fered by Dixon is "purely speculative and improbable." Friedman assails the credibility of Pala and Brewster, contending that what they say now is self-serving and inconsistent with statements they made earlier . He also avers that it would have been against Venture's inter est to structure the transaction so as to avoid ECRA. Lastly, Friedman contends that even had ECRA been avoided, Venture would have incurr ed other environmental liability in connection with the sale, and would have sued Dixon to recover those costs. As will appear, see infra note 15, we do not resolve these issues here.

18

Bronkesh, 621 A.2d 459, 465 (N.J. 1993), we think that Dixon was injured by O'Connor's purported malpractice by that time.

We acknowledge that not every claim made against a client--and not every counsel fee expended in defense of that claim--triggers the running of the statute of limitations for a legal malpractice claim. Accrual does not occur until a prospective plaintiff realizes that his or her lawyer has been negligent, and that he or she has been har med as a result of that negligence. The dispositive question, therefore, is when Dixon knew or should have known that any damages were attributable to O'Connor's negligent advice. See id. at 466. We conclude that Dixon had such notice by the time the October 21, 1985 letter was sent. By early 1985 Dixon had reason to believe that any ECRA costs it acquired in connection with the Jersey City transaction were due to O'Connor's failure to advise it about ECRA prior to the closing. And by October 21, 1985, Dixon had suffered ECRA-related costs in connection to that sale. We believe that Dixon was on notice that O'Connor's alleged malpractice may have caused it harm by that date, and therefore hold that Dixon's malpractice action against O'Connor and the Schumann firm accrued by October 21, 1985, and, consequently, expired October 21, 1991, six years later.

C.

We are unpersuaded by the arguments offered by Friedman and Franzblau Dratch in support of a later date for either accrual of Dixon's claim or the running of the statute of limitations.

1.

Friedman submits that the limitations period did not commence until at least July 21, 1989--the date that the Appellate Division reversed the Superior Court's decision and reinstated the Venture suit. 9 Friedman's argument is
_____

9. Friedman also argues that the limitations period did not start running until January 30, 1991, when the Supreme Court of New Jersey affirmed the Appellate Division's order. For the same reasons that we reject his submission that Dixon's claims against O'Connor and the Schumann firm did not accrue until 1989, we r eject this claim as well.

largely based on the facts of Grunwald v. Bronkesh, 621 A.2d 459 (N.J. 1993).

The plaintiff in that case had sued an attor ney who had represented him in a real estate transaction. Their association began when a third party expr essed interest in acquiring an option to buy a property that the plaintiff owned in Atlantic City, and the plaintiff r etained the defendant lawyer to draw up the relevant documents. The lawyer prepared two items: an option agr eement and a contract for sale, the latter of which was to be triggered if the third party exercised the option. The attorney presented both documents to the third party, instructing it to sign the option agreement and initial the contract for sale. Instead, the third party signed both documents.

The lawyer advised the plaintiff that by signing the sales contract, the third party had assumed an enfor ceable obligation to buy the property. Relying on this advice, the plaintiff bypassed another opportunity to develop his property. The third party, however , never exercised the option. Still acting on advice of the defendant lawyer, the plaintiff then sued the third party for specific performance of the contract for sale. A trial court rejected the plaintiff 's claim, holding that the third party never incurred an enforceable obligation to buy the property because it never intended to do so, and stating that the plaintif f should not have relied on his lawyer's advice that a binding contract had been created. This decision was later affirmed on appeal. The plaintiff then brought a legal malpractice action against the defendant lawyer, which the attor ney claimed was time-barred.

The central issue in Grunwald was when the plaintiff 's claim against the defendant lawyer accrued: The action was timely if accrual did not occur until after the conclusion of the appellate process in the plaintiff 's suit against the third party, but the claim was untimely if the limitations period had started running at or before the time of the trial court's initial adverse decision. The Supreme Court of New Jersey held that the plaintiff 's claim was time-barred because his claim had accrued at the time the trial court r ejected his claim against the third party. See Grunwald , 621 A.2d at 467. The Court determined that the plaintif f had been

20

injured when the third party first r efused to exercise its option after the plaintiff had bypassed another offer to develop the Atlantic City property, and that he had been injured again when he incurred litigation costs in his action against the third party. See id. And the Court held that the plaintiff gained knowledge that his injuries were attributable to his lawyer's negligence when the trial court held that he should not have relied on his lawyer's advice that a binding contract for sale had been cr eated between the third party and him. See id.

Friedman seeks to persuade us that, under Grunwald, a client never gains knowledge of his or her lawyer's fault until a court issues an adverse decision in an underlying litigation. He notes that the Grunwald court held that the plaintiff gained knowledge of his lawyer's fault when the trial court issued its adverse decision and "not when the third party took a position contrary to the advice the attorney had given, nor when plaintiff brought suit against the third party." Drawing an analogy between Grunwald and this case, Friedman submits that just as the plaintiff in Grunwald had no reason to feel that he was the victim of malpractice merely because the third party disagreed with his lawyer's interpretation of the thir d party's signing the contract for sale, Dixon had no reason to feel aggrieved by O'Connor's actions simply because Ventur e sought to impose "a novel legal liability upon Dixon--one not specifically set forth in the ECRA statute, and one which had not been the subject of any prior judicial determination." And, Friedman opines, because there was no adverse decision against Dixon in the underlying litigation until the Appellate Division reinstated Venture's ECRA suit on July 21, 1989, Dixon had no reason to believe that O'Connor had committed malpractice prior to that date.

We disagree. The bright-line rule Friedman seeks is inconsistent with Grunwald's clear statement that "knowledge of fault may occur before  . . . a judicial resolution of the underlying action." 621 A.2d at 466. The ultimate, case-specific question is "when a plaintiff knows or should know that the damage is attributable to the attorney's negligent advice." Id. And though the plaintiff in

21

Grunwald had no reason to believe that his attorney had committed malpractice until the first adverse decision in the underlying matter, the facts here ar e significantly different. The Grunwald opinion contains no evidence that anyone (other than, perhaps, the lawyer for the third party) told Grunwald that his lawyer may have render ed incorrect advice until the trial court did so in rejecting the plaintiff 's claim against the third party. Here, in contrast, Friedman informed Dixon that ECRA had applied to the sale in either late 1984 or early 1985--long before thefirst adverse decision. This is not a case where O'Connor gave Dixon incorrect counsel about ECRA; indeed, if it was there would be a strong argument that Dixon would not have gained knowledge of O'Connor's fault until a judicial ruling repudiated his advice. Instead, the evidence shows that O'Connor failed even to mention ECRA to Dixon prior to the closing. Under these circumstances, Dixon should have realized that O'Connor had made a mistake as soon as it learned that ECRA had applied to the sale.

2.

Franzblau Dratch presses a more elaborate argument. It first suggests that Dixon's claim against O'Connor accrued on May 27, 1986--the day Venture filed suit against Dixon seeking recovery for its clean-up costs. If true, then the limitations period would ordinarily have expir ed six years later on May 27, 1992. But Franzblau Dratch also contends that the limitations period was tolled for the 518 days between February 18, 1988, when the Superior Court threw out the Venture suit, and July 21, 1989, when the Appellate Division reinstated it. We will refer to this as the "tolling argument." If correct, then Dixon's time to sue O'Connor did not expire until October 27, 1993. Franzblau Dratch notes that Friedman severed his ties with it during the spring of 1993, and submits that it cannot be held liable because Friedman left the firm prior to the time that Dixon lost the right to sue O'Connor.10 We reject this

_____

10. Friedman and Franzblau Dratch disagree about whether Friedman left the firm on May 28, 1993 or June 1, 1993, but that dispute is ultimately irrelevant.

22

argument because: (1) we disagree with Franzblau Dratch as to when Dixon's claim against O'Connor accrued; (2) we disagree that the elements of "fault" and "damage" were not present between the time the Superior Court dismissed the Venture suit and the time the Appellate Division reinstated it, and, therefore, that Dixon could not have sued O'Connor during that period; and (3) we disagree that New Jersey law permits tolling in circumstances such as this one.

The foundation of Franzblau Dratch's tolling argument is its premise that Dixon's claim against O'Connor did not accrue until Venture sued Dixon. But if we are correct that the claim against O'Connor actually accrued by October 21, 1985, then the tolling argument fails on its own terms. If the statute started to run on October 21, 1985, then it ordinarily would have expired on October 21, 1991. Even if we were to add 518 days to that date, we would conclude that the limitations period ran on March 22, 1993--before Friedman severed his ties with Franzblau Dratch. See supra note 10. Franzblau Dratch's tolling argument thus makes no difference unless Dixon's claim accrued on May 27, 1986.

Franzblau Dratch's only argument in favor of May 27, 1986 as the accrual date is its suggestion that this is the day "found" by Judge Bassler. This argument suffers from two problems. First, because Judge Bassler was acting on a motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), he made no factual findings. At all events, our standard of review is plenary. See Lake v. Arnold, 232 F.3d 360, 365 (3d Cir. 2000). Second, we disagree with Franzblau Dratch's interpretation of Judge Bassler's opinion. Judge Bassler wrote that Dixon "clearly had knowledge of a claim for damages [against O'Connor] in either 1985 or at the latest, 1986." Judge Bassler also noted that Dixon conceded that it had such knowledge by 1986, and ultimately determined that Dixon "clearly received notice of [Venture's claim against it] by May 1986." (emphasis added). Because this suit was not filed until 1996, Judge Bassler's determination that Dixon's claim against O'Connor accrued in 1986 was sufficient to decide the issue before him: whether the six-year statute of limitations had run for purposes of a legal malpractice

23

action brought by Dixon against O'Connor's estate and the Schumann firm. There was simply no r eason for Judge Bassler to decide whether the claim accrued at an earlier date, and we believe that his opinion makes clear that he did not. We therefore adher e to our conclusion that Dixon's claim accrued by October 21, 1985. See supra Part III(B).

Moreover, we disagree with Franzblau Dratch's contention that the statute of limitations was ever tolled in this case. The firm asserts that the running of the statute was tolled because the elements of "fault" and"damage" necessary for the accrual of a legal malpractice claim were not present between the time the Superior Court dismissed the Venture suit and the time the Appellate Division reinstated it. During that period, Franzblau Dratch avers, Dixon had no reason to believe that O'Connor had been at fault or that any negligence on his part had caused it to suffer any damages.

We reject this "fault" argument for the same reason that we rejected Friedman's: It rests on a mistaken view of what O'Connor is alleged to have done wrong. Franzblau Dratch assumes that the Superior Court's initial decision to dismiss the Venture suit vindicated O'Connor's actions. Although this might be correct had O'Connor advised Dixon that ECRA did not create a private right of action for damages, that is not what O'Connor did. Instead, Dixon charges that O'Connor committed malpractice by failing to mention ECRA at all. The Superior Court's initial decision that Venture could not recover ECRA-imposed clean-up costs from Dixon may have limited the damage done by O'Connor's alleged dereliction, but it did nothing to change the fact that O'Connor had erred.

We also disagree with Franzblau Dratch's claim that Dixon had sustained no actionable damages between the time the Superior Court dismissed the Ventur e suit and the time the Appellate Division reinstated it. Dixon incurred counsel fees in responding to Ventur e's pre-suit demands and in defending the suit prior to the dismissal. Though Franzblau Dratch rightly points out that the incurring of counsel fees counts as injury for legal malpractice purposes only if the client has reason to attribute those fees to his or her lawyer's negligence, we conclude that that pr ecept is

24

satisfied here. Dixon's claim is that O'Connor failed to advise it about ECRA, and that this failure pr evented Dixon and Venture from structuring their transaction to avoid the statute. Under this scenario, if O'Connor had not been negligent, then ECRA would not have applied to the sale. As a result, any counsel fees Dixon incurr ed responding to Venture's demands after it became appar ent that ECRA had applied to the sale were attributable to O'Connor's negligence. Though the Superior Court's dismissal of the Venture suit may have lessened the extent to which Dixon was harmed, it did not change the fact that Dixon was forced to spend money defending an ECRA suit that might have been avoided entirely had O'Connor not (allegedly) committed malpractice. This is enough under New Jersey law. See Grunwald v. Bronkesh, 621 A.2d 459, 465 (N.J. 1993) (holding that for a legal malpractice claim to accrue, a plaintiff need not know the precise extent of his or her damages, or even have suffered all of the damages attributable to his or her attorney's negligence).

Finally, Franzblau Dratch's tolling argument is fundamentally inconsistent with the policies beyond New Jersey's statute of limitations as expressed in Grunwald, and it is unsupported by any relevant case law. The principal consideration underlying New Jersey's statute of limitations is fairness to defendants. See id. The Supreme Court of New Jersey has observed that allowing the limitations period on a legal malpractice claim to be postponed until the appellate process in an underlying litigation was complete could leave a lawyer unsur e whether he or she will be sued for an extraor dinarily long period of time. See id. In addition to denying peace of mind to lawyers, long delays would also result in trials being conducted after memories have faded and evidence has been lost. See id. Precisely the same could occur under Franzblau Dratch's proposed approach wher e the statute would be tolled, as a matter of law, during any period where the prospective plaintiff appears to have obtained a victory in an underlying litigation.[11]

_____

11. Indeed, the facts of this case provide an apt illustration. Dixon charges that O'Connor committed malpractice in 1983–84, but this suit was not filed until over a decade later. O'Connor died in 1992, and counsel for the Schumann firm informed us at oral argument that many of his records have been destroyed.

Franzblau Dratch has pointed to no relevant cases that allowed tolling in a situation such as this one. The only New Jersey cases it cites are inapposite, because the defendants in those cases had received notice of the claims against them within the limitations period. See Galligan v. Westfield Ctr. Serv., Inc., 412 A.2d 122, 123 (N.J. 1980) (defendant received notice when the plaintif f brought an action in federal court); Peloso v. Hartfor d Fire Ins. Co., 267 A.2d 498, 499–500 (N.J. 1970) (defendant insurance company had received notice when the plaintif f submitted its request for benefits); Mitzner v. W . Ridgelawn Cemetery, Inc., 709 A.2d 825, 826 (N.J. App. Div. 1998) (defendant received notice when the plaintiff br ought an action in New York state court, which was ultimately dismissed due to lack of personal jurisdiction).

The principal reason for statutes of limitations is to provide notice to defendants, see Grunwald , 621 A.2d at 465, and tolling the statute in cases where the defendant has nevertheless received notice does not under mine this policy. Critically different here is that there is no evidence that O'Connor ever received notice that Dixon may sue him at any time during the limitations period. The only case Franzblau Dratch references that allowed tolling in a situation such as this one is Pope County v. Friday, Eldredge & Clark, 852 S.W.2d 114 (Ark. 1993). In addition to not being a New Jersey case, Pope County's holding is based on a premise that the Supreme Court of New Jersey rejected in Grunwald: that a putative plaintiff has no legal malpractice claim until an underlying adverse decision is affirmed on appeal because his or her damages are speculative until that point. See Pope County , 852 S.W.2d at 115 (summarizing the court's prior holding in Stroud v. Ryan, 763 S.W.2d 76 (Ark. 1989)). For all of these reasons, we reject Franzblau Dratch's tolling ar gument.

D.

We conclude that Dixon's malpractice claim against O'Connor accrued no later than October 21, 1985 and that it expired no later than October 25, 1991. W e therefore hold that the District Court did not err in granting the motions

26

by O'Connor and the Schumann firm to dismiss the claims against them as time-barred.

IV.

Having determined when Dixon's malpractice claim against O'Connor became time-barred, we tur n to whether there is a genuine issue of material fact as to whether Friedman committed malpractice. This inquiry encompasses two issues: (1) Is there a genuine dispute of fact as to whether an attorney-client r elationship arose between Friedman and Dixon concerning a potential malpractice claim against O'Connor?; and, if so, (2) Is there a genuine dispute as to whether Friedman breached any professional duty that arose out of that r epresentation?12 Because we conclude that there are genuinely disputed facts going to both issues, we will reverse the District Court's grant of summary judgment in favor of Friedman and Franzblau Dratch.

A.

The threshold question is whether Friedman cr eated an attorney-client relationship with Dixon with respect to a potential malpractice action against O'Connor in 1989.13

---

12. The parties have not directed to our attention to any New Jersey case expressly holding that the first of these questions is a jury issue, but we
will assume that it is because counsel for both Dixon and Friedman agreed on this point at oral argument.
13. As we noted supra at Part I(A), Friedman and Joyce also discussed the possibility of suing O'Connor in the spring of 1992. At that time, Friedman advised Joyce that it was "clear" that there was no statute of limitations problem. This advice was based on the Appellate Division's decision in Grunwald v. Bronkesh, 604 A.2d 126 (N.J. App. Div. 1992) ("Grunwald I"), which was ultimately overruled by Grunwald v. Bronkesh, 621 A.2d 459 (N.J. 1993) ("Grunwald II"). The District Court granted summary judgment against Dixon in part because it concluded that it had been reasonable for Friedman to rely upon Grunwald I at the time of the 1992 conversation. Although Dixon assails this ruling by the District Court, contending that New Jersey law gover ning the accrual of a legal malpractice claim was anything but clear in 1992, we need not resolve this dispute. Because we have deter mined that the statute of limitations ran on any claim against O'Connor by the fall of 1991, anything that Friedman said about such a suit in 1992 is immaterial.

27

According to the Restatement of the Law Gover ning Lawyers S 26 (Proposed Final Draft No. 1 1996)--which was quoted with approval in Herbert v. Haytaian , 678 A.2d 1183, 1188 (N.J. App. Div. 1996), and which both parties agree accurately states New Jersey law--an attorney-client relationship is created with respect to a particular matter when:

> 1) a person manifests to a lawyer the person's intent that the lawyer provide legal services to the person; and either
>
> (a) the lawyer manifests to the person consent to do so; or
>
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.

Because there is a genuine issue of material fact as to whether an attorney-client relationship was created pursuant to S 26(1)(b), we do not addr ess S 26(1)(a).

The first question is whether Joyce manifested an intent that Friedman provide legal services. Friedman has never seriously disputed the existence of this factor , and with good reason. Joyce (on behalf of Dixon) clearly manifested such an intent when, in 1989, he sought Friedman's advice about the possibility of suing O'Connor for malpractice.

Friedman rests primarily on the assertion that he "manifest[ed] lack of consent to" advise Dixon, but that argument does not carry the day. Accor ding to Friedman's deposition, the strongest statement he made in 1989 was: "I don't like to handle claims against lawyers, and I'm not sure that this one has any real foundation, and I'm certainly not going to handle a claim that I don't think has a foundation." This statement could be interpr eted in at least two ways: Either Friedman was simply infor ming Joyce that he would not pursue a malpractice action against O'Connor unless he concluded that it had merit, or he was refusing to advise Dixon at all. The pr ocedural posture of this case mandates that we r esolve ambiguities in favor of Dixon, and, as a result, we do not read this

28

statement as an affirmative refusal by Friedman. Therefore, we cannot say that there is no genuine issue of material fact with respect to this factor.

The final issue in determining whether an attorney-client relationship arose between Dixon and Friedman with respect to a malpractice action against O'Connor is whether Dixon reasonably relied on Friedman to pr ovide such services and whether Friedman knew or should have known that it was doing so. Though the question is close, three things convince us that there is a genuine dispute of material fact as to this issue.

First, at the time of the 1989 conversation, Friedman was also representing Dixon in the Venture litigation. The Venture suit and the potential malpractice action against O'Connor arose out of the same set of historical events: Dixon's sale of the Jersey City property to V enture. The fact that Dixon was already relying on Friedman for advice and representation in a closely related matter supports an inference that Dixon expected Friedman to advise it about a potential malpractice action against O'Connor and that Friedman knew or should have known that fact.

Second, despite his purported reluctance to do so, Friedman admitted that he gave Dixon legal advice about suing O'Connor during the 1989 conversation. Friedman originally claimed that his 1989 conversation with Joyce was not actually about bringing an action against O'Connor, but rather was concerned with determining whether Friedman was willing to undertake such a representation. But when directly asked whether his statement to Joyce that he doubted that any claim against O'Connor would have merit constituted "advice to a client," Friedman admitted that it "probably" did. The fact that Friedman gave such advice on one occasion could support an inference that Dixon reasonably expected him to do so in the future, and that Friedman knew or should have known that Dixon would so rely.

Finally, though the depositions are unclear as to how Joyce and Friedman left their 1989 conversation, we believe that the reasonable reading most favorable to Dixon supports an inference that Dixon expected Friedman to get

29

back to it about a potential malpractice claim against O'Connor and that Friedman knew or should have known of that expectation. According to Friedman, he told Joyce that there was no need to decide whether to sue O'Connor at that time because they were going to attempt to convince the Supreme Court of New Jersey to throw out the Venture suit. This statement, particularly in light of the parties' on-going relationship, might reasonably be understood as a promise by Friedman to revisit the matter with Joyce once the underlying appeal was complete.

This conclusion is also supported by Joyce's deposition. Reading his deposition most favorably to Dixon, see supra note 3 and accompanying text, Joyce recalled that Friedman told him he did not "handle" malpractice actions "personally" but that he would "check with[his] firm" to see if another lawyer would, and, if not, he would find another lawyer for Dixon. This testimony supports an infer ence that, at the very least, Dixon was relying on Friedman to find a lawyer to "handle" the malpractice action against O'Connor, and that Friedman knew or should have known that it was doing so.

Cutting most strongly against the conclusion that Dixon was relying on Friedman to advise it about a malpractice action against O'Connor are the letters Joyce wrote to Friedman in 1992. In the August 19, 1992 letter Joyce wrote that "[a]s distastefully as it is for me professionally, it would seem that our attorney at the time of closing [i.e., O'Connor] should have know of the ECRA requirements and, therefore, a malpractice action should be initiated -- hopefully by your firm . . . ." Joyce got no response to this letter, and wrote Friedman another dated November 25, 1992. At the end of this second letter, Joyce informed Friedman that he had been speaking with another lawyer about the Venture litigation, pr ovided Friedman with that lawyer's phone number, and stated that "his firm does a lot of malpractice (the scum) and insurance work and, if your firm does not, please feel free to discuss these issues also."

These letters could be understood as indicating that Dixon was not relying on Friedman to advise it about a malpractice suit against O'Connor because they imply that Joyce himself did not believe that Friedman had agr eed to

30

advise Dixon in such a suit. This is not the only r eading of the evidence, however. First, as pointed out by Dixon at oral argument, the fact that Friedman may have communicated to Dixon that he would not personally litigate a malpractice action against O'Connor would not preclude a finding that he agreed to advise Dixon about one, and an agreement to give advice is all that is necessary to establish an attorney-client relationship. Second, to the extent the letters shed light on Dixon's state of mind, they do so primarily in terms of what Joyce was thinking in 1992. The question before us, however, is not whether Dixon was relying on Friedman to provide legal advice in 1992. Rather, it is whether Dixon was so r elying between 1989 (when the first conversation between Joyce and Friedman occurred) and the fall of 1991 (when the statute of limitations ran on any claim against O'Connor). The relevant time period ended in the fall of 1991, but Joyce's letters were not sent until the summer of 1992. In the interim, Joyce and Friedman had at least one additional conversation about suing O'Connor, and that conversation may have changed Joyce's understanding of the state of affairs between Friedman and Dixon. Because of this, the letters are not dispostive as to Joyce's (and thus Dixon's) understanding of the situation between 1989 and 1991.

We therefore hold that ther e is a genuine issue of material fact as to whether Friedman created an attorney-client relationship between himself and Dixon in 1989 with respect to a potential malpractice claim against O'Connor.

B.

The final issue before us––assuming an attorney-client relationship existed––is whether ther e is a genuine dispute as to whether Friedman breached a professional duty that he owed to Dixon. "[L]awyers owe a duty to their clients to provide their services with reasonable knowledge, skill, and diligence." Ziegelheim v. Apollo, 607 A.2d 1298, 1303 (N.J. 1992). But because " `[w]hat constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attor ney undertakes to perform,' " the Supreme Court of New Jersey has formulated the standard of care"in rather broad terms." Id.

31

(quoting St. Pius X House of Retreats v. Diocese of Camden, 443 A.2d 1052 (N.J. 1982)); see also Conklin v. Hannoch Weisman, 678 A.2d 1060, 1069 (N.J. 1996) ("Malpractice in furnishing legal advice is a function of the specific situation and the known predilections of the client.").

Some general precepts are nevertheless clear. A lawyer "must take `any steps necessary in the pr oper handling of [a] case,' " and these steps "include, among other things, a careful investigation of the facts of the matter, the formulation of a legal strategy, the filing of appropriate papers, and the maintenance of communication with the client." Ziegelheim, 607 A.2d at 1303 (quoting Passanante v. Yormark, 350 A.2d 497 (N.J. App. Div. 1975)). A lawyer is also "obligated to keep the client informed of the status of the matter for which the lawyer has been retained, and is required to advise the client on the various legal and strategic issues that arise." Id.

1.

The District Court granted summary judgment against Dixon partly because it read the recor d as saying that during the 1989 conversation Friedman told Joyce that Dixon need not decide whether to sue O'Connor at that time "because there was no imminent statute of limitations problem." Even if Dixon was ultimately corr ect that its claim against O'Connor accrued in the fall of 1985 and expired in the fall of 1991 (and we have deter mined that it was), the District Court stressed that Dixon still had over two years to sue O'Connor at the time of the 1989 conversation, which occurred during the summer of that year. Accordingly, to the extent that Friedman counseled Dixon that there was no "imminent" statute of limitations problem in the summer of 1989, his advice was sound. And because the advice was correct when given, the District Court reasoned that it was non-actionable "due to the legal principle that [a] plaintiff suf fers no damage as a result of receiving correct advice."

To the extent that the District Court concluded that Friedman's actions in 1989 alone would not support malpractice liability, we have no quarrel with its analysis.

32

Disagreeing, Dixon infers from the court's holding that it relied on the "judgmental immunity defense" recognized in Procanik v. Cillo, 543 A.2d 985 (N.J. App. Div. 1988). Acknowledging that law is not always static and predictable, Procanik shields fr om malpractice liability lawyers who offer a "reasoned pr ofessional evaluation" based on the "exercise of an informed judgment"--even if their advice later turns out to have been incorrect. Id. at 994. Because Friedman admits that he did no r esearch regarding the statute of limitations in 1989, Dixon contends that Friedman is ineligible for this defense. Though Dixon's argument on this point is sound, it is also irrelevant. What it misses is that "advice" that the District Court understood Friedman as having given Dixon in 1989, i.e., that there was no "imminent" statute of limitations pr oblem, was accurate. And, like the District Court, we fail to see how receiving correct legal advice could ever cause harm to a client.

2.

Dixon's primary contention, however, is not that Friedman committed malpractice by giving it incorr ect advice in 1989. Instead, it submits that Friedman br eached his professional duties by doing nothing whatsoever between the 1989 conversation and when the statute of limitations ran on any claim against O'Connor in 1991. Specifically, Dixon alleges that Friedman committed malpractice by: (1) advising Dixon in 1989 to delayfiling a claim against O'Connor; (2) assuring Dixon that he would revisit the issue again; (3) neglecting to r esearch when the limitations period would run; and (4) failing to r evisit the issue or to advise Dixon further about a claim against O'Connor until after the statute of limitations ran in 1991.

When the evidence is read in the light most favorable to Dixon, we believe that there is a genuine issue of material fact as to whether Friedman committed malpractice. W e have already determined that ther e is a genuine issue as to whether Friedman created an attorney-client relationship between himself and Dixon with regard to a potential malpractice action against O'Connor. If such a relationship arose, Friedman assumed a duty to take any steps

33

necessary for the proper handling of the matter , to communicate about the matter with Dixon, and to advise it about the legal and strategic issues involved in the representation. See Ziegelheim v. Apollo, 607 A.2d 1298, 1303 (N.J. 1992). Substantial New Jersey case law supports the proposition that a lawyer has a specific duty to research, monitor, and advise his or her clients about statutes of limitations. See Sommers v. McKinney , 670 A.2d 99, 104 (N.J. App. Div. 1996) (observing that "[i]n rare cases, expert testimony is not required in a legal malpractice action where the duty of car e to a client is so basic that it may be determined by the court as a matter of law" and referencing the example of a lawyer who fails to file suit before the running of the statute of limitations); Brizak v. Needle, 571 A.2d 975, 982–83 (N.J. App. Div. 1990) (finding the evidence sufficient to support a jury's finding of malpractice in a case where a lawyer failed to advise a client about the statute of limitations based on his mistaken view of when the claim accrued); Fuschetti v. Bierman, 319 A.2d 781, 784 (N.J. Law Div. 1974) ("The failure of an attorney to commence an action within the time of the statute would ordinarily be considered neglect.").

In Brizak, the Appellate Division held that there was enough evidence to support a jury's verdict in favor of the plaintiff in a legal malpractice action. See 571 A.2d at 982–85. The plaintiff had retained the defendant lawyer to represent her in a medical malpractice action. The lawyer never counseled the plaintiff about the statute of limitations because of his erroneous belief that a medical malpractice claim does not accrue until a plaintiff secur es an opinion by another doctor that the doctor he or she wishes to sue was negligent. See id. at 980, 982. This evidence, the Appellate Division held, was sufficient to support the jury's finding that the defendant lawyer had been negligent. After surveying applicable New Jersey case law, see id. at 981–82, the court determined that, based on "the state of the law when defendant made his judgment[,] ther e was no reasonable basis for his belief " as to when the plaintiff 's medical malpractice claim would accrue. Id. at 982. Moreover, the court indicated that it would have sustained the jury's verdict even had the defendant's mistaken belief

34

been reasonable because the defendant had failed "to warn plaintiff that her claim could be time-barr ed sooner in the event his belief [as to when her medical malpractice claim would accrue] was wrong." Id.

In light of both the general standards laid down by the Supreme Court of New Jersey and the specific precedent of Brizak, we hold that there is a genuine dispute of fact as to whether Friedman was negligent.14 The record establishes that Friedman did nothing with regar d to a claim by Dixon against O'Connor at any time between the initial conversation in the summer of 1989 and when the statute of limitations expired in the fall of 1991. Friedman never revisited the issue with Dixon during that time, he did no research to determine when the statute of limitations might expire, he did not file suit on Dixon's behalf, and he made no effort to secure another attor ney for Dixon. Under these circumstances, we think there is a genuine issue of material fact as to whether Friedman exercised reasonable and ordinary care and diligence.

One might argue that Friedman did not br each a professional duty because, at most, he agr eed only to find a lawyer to handle Dixon's malpractice claim--not to research, monitor, and advise Dixon about the statute of

_____

14. Brizak can be read as indicating that some attorneys who fail to advise or misadvise their clients about statutes of limitations are liable for malpractice as a matter of law. Such a rule might be viable in two sorts of cases: (1) where a lawyer never mentions the statute of limitations or the risks inherent in late-filing prior to the time the underlying claim expires; or (2) where a lawyer falsely describes muddy legal waters as clear. Indeed, Brizak suggests that liability may attach if a filing deadline is missed because a lawyer failed to counsel a client that the lawyer's opinion as to the status of the governing standards is vulnerable and might turn out to be wr ong in light of lurking problems with respect to the stability of precedents that inform the lawyer's opinion. In this case, however, we have no occasion to predict whether the Supreme Court of New Jersey would so hold. As we noted previously, Dixon has not appealed the District Court's denial of its motion for summary judgment; it has appealed only the grant of summary judgment in favor of Friedman and Franzblau Dratch. The only question before us, therefore, is whether the record would support a finding that Friedman committed malpractice--not whether it compels one.

35

limitations. We conclude, however, that this argument is not sufficient to compel summary judgment in Friedman's favor. First, there is no evidence that Friedman took any action with respect to getting Dixon another attorney between 1989 and 1991. Even if he assumed an obligation only to do that one thing, Friedman was obligated to do what he promised and there is no evidence that he did.

Additionally--assuming that an attorney-client relationship was created--we disagr ee that Friedman was obligated to do nothing more than find Dixon another lawyer. This argument conflates two different inquiries: (1) whether an attorney-client relationship was created between Friedman and Dixon with respect to a malpractice action against O'Connor; and, assuming it was (2) whether Friedman breached a professional duty. As we have explained above, the evidence suggesting that Friedman promised to look into getting another lawyer to handle the matter is probative as to whether Friedman cr eated an attorney-client relationship with r espect to the O'Connor matter. Assuming that such a relationship was created, however, we do not believe that Friedman is entitled to summary judgment on the grounds that that is all he agreed to do. Once an attorney-client r elationship is created with respect to a given matter, New Jersey's Rules of Professional Conduct states that a lawyer may only "limit the objectives of representation" if"the client consents after consultation." New Jersey Rules of Professional Conduct, Rule 1.2; see also Baxt v. Liloia, 714 A.2d 271, 275 (N.J. 1998) (Rules of Professional Conduct ar e relevant to, though not dispositive of, the question whether a lawyer committed malpractice). We do not believe that the evidence establishes as a matter of law that Friedman expressly informed Dixon that he would do no mor e than see if he could find it another attorney, much less that Dixon ever consented to this limitation.

We therefore conclude that if Friedman created an attorney-client relationship with r espect to a malpractice claim against O'Connor (an issue on which we have already concluded that there is a genuine issue of material fact), there is a genuine issue of material fact as to whether he breached the professional duties such r epresentation

36

imposed. We will therefore r everse the District Court's order granting summary judgment in favor of Friedman and Franzblau Dratch.15

V.

The Judgment in Nos. 99-6055 and 99-6056, dismissing the claims against O'Connor's estate and the Schumann firm, will be affirmed. The Judgment in No. 99-6054, granting summary judgment in favor of Friedman and Franzblau Dratch, will be reversed and the case remanded for further proceedings consistent with this opinion. Parties to bear their own costs.

_____

15. On appeal, Friedman and Franzblau Dratch pr offer another basis for affirming the judgment in their favor . Dixon's action against Friedman is based on its contention that he caused it to lose its malpractice claim against O'Connor. But even if Friedman was negligent, his dereliction caused no harm to Dixon unless it had a valid claim against O'Connor. Friedman and Franzblau Dratch argue that Dixon and Venture would not have been able to avoid ECRA even had O'Connor advised Dixon about it. If this is true then any negligence by O'Connor caused no harm to Dixon, and Dixon had no valid malpractice claim against Friedman. This is a straightforward example of the case-within-a-case phenomenon that often arises in professional malpractice litigation.

Dixon offered evidence in response to Friedman and Franzblau Dratch's charges. See supra note 8. Although the District Court described this issue as being "problematic" for Dixon, the court never resolved it. We could certainly consider this argument given our plenary standard of review, see, e.g., Hudson United Bank v. LiTenda Mortgage Corp., 142 F.3d 151, 159 (3d Cir. 1998), but we decline to do so. Determining whether there is a genuine dispute of fact over whether Dixon and Venture could have avoided ECRA had O'Connor told Dixon about it will require a highly fact-intensive, and ultimately counterfactual inquiry (because O'Connor did not, in fact, ever tell Dixon about ECRA). We therefore believe that the sounder course of action is to give the parties an opportunity to focus on this complicated issue during a further round of briefing and to allow the District Court to rule on it in the first instance.

37

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit